SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. R.F.P.** (A-5-25) (090566)

**Argued March 2, 2026 -- Decided July 9, 2026**

**JUSTICE FASCIALE, writing for the Court.**

In this appeal, the Court considers whether the trial judge correctly applied the standard set forth in State v. Chambers, 252 N.J. 561 (2023), in granting defendant R.F.P.'s motion for an in camera review of the alleged sexual assault victim's pre-incident mental health records.

In May 2021, "Kim," the alleged victim, age eighteen, stated that her uncle had sexually assaulted her. Kim was examined by a sexual assault nurse and interviewed by detectives from the Bergen County Prosecutor's Office. Kim told the detectives that while she was in defendant's room searching for her cat, defendant kissed her, pushed her onto his bed, and then proceeded to engage in further sexual acts without her consent. Kim reported her medical history as "[a]utism, bipolar I, PTSD, asthma, seizures, hypothyroid, [and] anxiety," and listed her current medications. A grand jury charged defendant with offenses including sexual assault.

According to the defense, Kim gave conflicting accounts of the incident. After learning about Kim's diagnoses and psychotropic medications, defense counsel retained an investigator to learn whether a connection exists between Kim's mental illnesses and her ability to perceive, recall, or recount details. After interviewing Kim's family members, best friend, and boyfriend, the defense filed a motion for an in camera inspection of her pre-incident mental health records.

The trial judge considered Kim's mental illnesses; the list of multiple medications she had been prescribed at the time of the incident, including an antipsychotic; Kim's statements to the police, including that she had reported rape on "countless occasions"; Kim's statement to the sexual assault nurse examiner; defendant's statements; the statements from Kim's family and friends, which corroborated that Kim had a history of making false accusations of rape and not being truthful; evidence that Kim left a hospital against clinical advice close in time to the incident; Kim's best friend's statement that he believed Kim was not taking her medicine; and medical articles indicating that bipolar disorder and PTSD can produce testimonial incapacities and on autism and the ability and tendency to lie.

1

The trial judge ordered that Kim's pre-incident mental health treatment records, limited to her two most recent hospitalizations, be produced to the trial judge for an in camera review. He stated that the production of mental health records for in camera review does not mean that those records will automatically be disclosed to defendant following such review. The Appellate Division determined that defendant failed to meet the heightened discovery standard established in Chambers and reversed. The Court granted leave to appeal. 261 N.J. 568 (2025).

**HELD:** The trial judge correctly applied Chambers, and, upon review of the record, the Court discerns no abuse of discretion in his finding that defendant made a sufficient showing for the judge to conduct a limited and narrow in camera review.

1. A heightened discovery standard governs a defendant's motion for pre-incident mental health records from a sexual assault victim. The standard is rigorous due to the need to balance a criminal defendant's constitutional right to present a complete a defense against the significant privacy interests of sexual assault victims. In Chambers, the Court held that "a defendant is entitled to present a meaningful defense by making a good-faith request for pre-incident mental health records of a sexual assault victim." 252 N.J. at 589. (p. 17)

2. Chambers requires that victims be given notice and the opportunity to be heard when a defendant files a motion seeking access to pre-incident mental health records. Noting that, here, Kim did not initially receive notice, the Court reminds the State of its duty to provide timely notice to a victim whenever a defendant files a Chambers motion and reminds trial judges to ensure -- at the onset of the hearing -- that the victim has received both notice and an opportunity to oppose the motion, as required by the Crime Victims' Bill of Rights, N.J.S.A. 52:4B-36(r). (pp. 17-18)

3. The first stage of the Chambers standard requires a defendant to show, by a preponderance of the evidence, that (1) the defendant has "a substantial, particularized need" for the records; (2) "the information sought [therein] is relevant and material;" and (3) "the information is not available through less intrusive means." Id. at 590. If a defendant satisfies that three-part standard, then the defendant is entitled to have the trial judge conduct an in camera inspection. Id. at 591. During the second stage, the judge must determine whether to "pierce" the applicable mental health privilege, redact the records, and make them available under a protective order. Id. at 592. At issue here is the first stage: whether defendant is entitled to have the trial judge conduct an in camera inspection of the records. (p. 18)

4. "To establish a substantial, particularized need for access to mental health records," a defendant must make "some evidential showing that connects the alleged mental illness to the victim's inability to perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate them -- the sole

2

permissible purpose for which access may be granted." Id. at 590. The Court reviews the evidence here in detail and explains that, in its entirety, defendant's proffered evidence shows: Kim has specific mental illness diagnoses; Kim received treatment for her mental illnesses at several psychiatric facilities; Kim checked out of the most recent facility against medical advice; Kim is prescribed medication for her mental illnesses; Kim may not have been medication-compliant at the time of the alleged assault; Kim's friends and family describe her as having "a tendency to lie" and as someone who, due to her mental illnesses, may not appreciate the consequences of lying; Kim demonstrated an inability to accurately recount past events; Kim provided conflicting accounts regarding details of the alleged assault; and Kim's mental illnesses can produce the types of testimonial incapacities she has demonstrated. Collectively, the evidence amounts to more than bald assertions that Kim's mental illnesses may affect her ability to perceive, recall, or recollect the assault, or a proclivity to fabricate it. Accordingly, defendant established a substantial and particularized need for Kim's pre-incident mental health records and thereby satisfied the first prong of the Chambers analysis. (pp. 18-28)

5. The second prong requires defendant to prove that the information sought is both relevant and material. Ibid. The central question here is whether defendant reasonably believed that Kim freely and affirmatively consented to engage in sexual activity with him. Because the record shows that information sought from the records may indicate that Kim has a proclivity to imagine or fabricate the alleged assault, the information is relevant and material to defendant's defense. (pp. 29-31)

6. Under the third prong, defendant must demonstrate by a preponderance of the evidence that the information sought is not available through less intrusive means. Id. at 591. Here, defendant has demonstrated gaps in the evidence as to Kim's mental illnesses and treatment, and the only way for defendant to reliably obtain such information is through Kim's pre-incident mental health records. (pp. 31-32)

7. The Court reiterates that this case concerns only the initial stage of the Chambers analysis. The Chambers framework is intentionally structured to impose increasing burdens on defendants as they progress from stage one to stage two, thereby aligning the degree of intrusion with the protection due to the alleged victim's privacy rights. As the trial judge expressly acknowledged, his preliminary determination to conduct a narrow in camera review does not mean that defendant will automatically be entitled to the mental health records. If, after that review, the judge determines that the records contain relevant material and that the mental health privilege should be pierced, Kim will be afforded an opportunity to challenge those findings. Noting that, under Chambers, requests for an alleged sexual assault victim's pre-incident mental health records "should remain rare," id. at 571, the Court finds that this is one such rare case. (pp. 33-35)

3

**REVERSED.**

**JUSTICE-PIERRE-LOUIS, dissenting,** disagrees with the determination that defendant's statements are not relevant to whether an in camera review is warranted. Justice Pierre-Louis notes that, when asked by police, "You knew it was not consensual, right?" defendant responded "Yes" and corroborated many details of the incident that Kim reported, yet now moves for access to Kim's mental health records based on a "good faith" belief that her mental health conditions potentially affect her ability to perceive events and relay information. In Justice Pierre-Louis's view, the fact that defendant stated in his own words that Kim did not imagine or falsify what transpired during the alleged sexual assault undermines the relevance and materiality of Kim's confidential records. And failure to consider that statement, if admissible, undermines the delicate balancing of defendants' and victims' rights established in <u>Chambers</u>, Justice Pierre-Louis explains.

**JUSTICES PATTERSON, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE FASCIALE's opinion. JUSTICE PIERRE-LOUIS filed a dissent, in which CHIEF JUSTICE RABNER joins.**

SUPREME COURT OF NEW JERSEY

A-5 September Term 2025

090566

State of New Jersey,

Plaintiff-Respondent,

v.

R.F.P.,

Defendant-Appellant.

_____

K.S.,

Intervenor-Respondent.

On appeal from the Superior Court,
Appellate Division.

Argued
March 2, 2026

Decided
July 9, 2026

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

Deepa S. Y. Jacobs, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Deepa S. Y. Jacobs, of counsel and on the briefs).

Richard D. Pompelio argued the cause for intervenor K.S. (New Jersey Crime Victims' Law Center, attorneys;

Dyanne Veloz Lluch, of counsel and on the brief, and Richard D. Pompelio, on the brief).

Angela E. Juneau argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; C.J. Griffin, of counsel, and Angela E. Juneau, of counsel and on the brief).

Ronald K. Chen argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Rutgers Constitutional Rights Clinic Center for Law & Justice, and American Civil Liberties Union of New Jersey Foundation, attorneys; Jeanne LoCicero and Ezra D. Rosenberg, of counsel and on the brief, and Ronald K. Chen and Jessica Rofé, on the briefs).

Kaili E. Matthews, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Jennifer Davenport, Attorney General, attorney; Kaili E. Matthews, of counsel and on the brief).

JUSTICE FASCIALE delivered the opinion of the Court.

In State v. Chambers, we set forth a standard to balance two important sets of rights: a defendant's constitutional right to present a meaningful defense, and the significant privacy interests of sexual assault victims. 252 N.J. 561, 589-91 (2023). Under that careful balance, a defendant may obtain an in camera inspection of a victim's pre-incident mental health records only upon showing, by a preponderance of the evidence, "(1) that there is a substantial, particularized need for such access; (2) that the information sought

is relevant and material; and (3) that the information is not available through less intrusive means." Ibid. In this appeal, we consider whether the trial judge abused his discretion by granting defendant's motion for an in camera review of the alleged sexual assault victim's pre-incident mental health records.

We conclude the trial judge correctly applied Chambers, and, upon review of the record, we discern no abuse of discretion in his finding that defendant made a sufficient showing for the trial judge to conduct a limited and narrow in camera review. We therefore reverse the judgment of the Appellate Division.

## I.

In April 2021, Kim, the alleged victim, age eighteen, moved to live with her biological father, Andrew.[1] Andrew resided with his brother (defendant); his sister, Tamara; and her boyfriend, Scott. On May 30, 2021, Kim told Andrew that defendant sexually assaulted her the day before. Kim and Andrew went to the hospital, where Kim was examined by a sexual assault nurse and interviewed by detectives from the Bergen County Prosecutor's Office.

Kim told the detectives that while she was in defendant's room searching for her cat, defendant kissed her, pushed her onto his bed, and then proceeded

---

[1] We use pseudonyms for the alleged victim and her family members.

3

to engage in further sexual acts without her consent.  Kim self-reported her medical history as "[a]utism, bipolar I, PTSD, asthma, seizures, hypothyroid, [and] anxiety," and that her current medications included "[V]istaril, [S]eroquel, trazadone, lithium, desmopressin, albuterol, Lamictal, [S]ynthroid, clindamycin, benzoyl peroxide, [and] 'intonis.'"

Kim also shared with the detectives that after the incident, she texted her best friend and former boyfriend, Ivan.  In their text messages, Kim stated, "There is something [defendant] did in this house . . . I don't know who to tell . . . nobody will believe me."  Ivan then asked if "it was sexual"; Kim responded "yes."  Ivan further inquired whether defendant "raped someone," and Kim replied, "He did it to me and told me that I can't tell anyone."  Kim said multiple times her father "won't believe me."  The following day, Kim informed the police -- in a sworn statement -- that she had previously reported to her father that she had been raped on "countless occasions."  Contrary to her statements to Ivan, Kim told officers that her father always took her reports of rape seriously.

Defendant, during his lengthy statement to the police, explained that after Kim went into his bedroom to look for her cat, she got into his bed to "cuddle," and while they cuddled, their touching became sexual and "one thing

4

led to another." He explained the sex was consensual, conceded it was "wrong," and expressed shame and regret.[2]

A grand jury indicted defendant and charged him with various offenses, including second-degree sexual assault and fourth-degree criminal sexual contact.

According to the defense, Kim gave conflicting accounts regarding the details of the incident, most notably "on the point of ejaculation." In her text

---

[2] The State asserts that, at the conclusion of defendant's statement to police, he "reluctantly conceded that [Kim] was uncomfortable" and "[u]ltimately . . . admitted . . . that he knew his actions were not consensual." The defense, however, argues that this characterization misrepresents his statement. Specifically, defendant asserts that (1) he believed Kim was merely "uncomfortable in the position in which she was lying on the bed" and (2) the "purported admissions" were "semi-affirmative answers" given by defendant, a developmentally disabled person, after being "doggedly" questioned by police for over two hours.

We disagree with our dissenting colleague that defendant's statements to police are dispositive to a <u>Chambers</u> analysis. The parties dispute the substance of defendant's statements, and defendant indicated his intent to challenge their trial admissibility. We cannot conclude, as the dissent contends, that defendant's "own words" conclusively show that "Kim <u>did not</u> imagine or falsify what transpired during the alleged sexual assault." <u>Post</u> at ___ (slip op. at 2). Defendants are presumed innocent until proven guilty and the weight of the prosecution's evidence, including defendant's own statements, is for the jury to resolve.

Additionally, any purported admissions made by defendant do not eliminate his right to mount a meaningful defense. Under the totality of the facts of this case, which are in stark contrast to the facts in <u>Chambers</u>, his statements are not relevant to our analysis in determining whether defendant is entitled to a limited and narrow in camera review of the records.

exchange with Ivan, Kim stated defendant "came on me." The next day, she reportedly told the sexual assault nurse examiner she was not sure if defendant ejaculated. In response to the police asking Kim if defendant ejaculated, Kim told them, "I wouldn't have known what to look for." Upon police follow-up questions, Kim responded "I don't know, I don't know."

After learning about Kim's diagnoses and psychotropic medications, defense counsel retained an investigator to learn whether a connection exists between Kim's self-reported mental illnesses and her ability to perceive, recall, or recount details of the incident or might reflect a proclivity to imagine or fabricate. In February 2022, the investigator interviewed Tamara and Scott, and in March 2023, he interviewed Ivan and Peggy, Kim's adoptive mother. Tamara had also been interviewed by a different investigator in 2021, just a few weeks after the incident occurred. The record contains the investigators' summaries of the interviews.

In her 2021 interview, Tamara explained that Kim's biological mother died when Kim was three years old and that Andrew lost custody of Kim due to his own disabilities. Tamara stated that in April (a month or two before the incident), Andrew helped Kim check herself out of Virtua Memorial Hospital, where Kim had been receiving treatment for mental health illnesses. According to Tamara, Kim left the hospital without her adoptive parents'

6

knowledge. Tamara reported that Kim bragged about accusing an ex-boyfriend of rape when he broke up with her, and that she planned to make it seem like her boyfriend raped her because she did not get what she wanted. Tamara also told investigators that Kim had a habit of making false accusations when upset and had an inability to appreciate the consequences of lying due to her mental incapacities.

Scott told the investigator that Kim had been in a psychiatric hospital before she moved into the house where the incident occurred. Scott corroborated Tamara's statement that Kim was not supposed to be released from the hospital and that Andrew checked her out of that hospital without her adoptive parents' knowledge. Scott explained that he too had heard Kim brag about making false accusations of rape against various men. And that when he asked Kim why she would do that, Kim stated, "[T]hat's how I am."

Peggy informed investigators that she and her husband adopted Kim at four years old, and she described Kim as someone with "many learning disabilities and challenges." Peggy reported that Kim had an extensive history of psychiatric treatment, including a ten-month stay in a residential group home. She confirmed that, prior to moving into the house with her biological father, Kim left the program at Virtua Memorial Hospital against clinical advice. Stating that she was uncomfortable talking about the incident, Peggy

7

explained that Kim is "troubled and it is hard to believe what she says sometimes."

Ivan corroborated Peggy's description of Kim. He said that Kim had several mental health conditions, including autism and PTSD, and that Kim had been prescribed medication. Ivan did not believe Kim took her medication and described her, like the others who were interviewed, as someone who "tends to lie a lot." Ivan said he was her best friend at the time of the incident and the first person she contacted.[3]

Defendant filed a motion for an in camera inspection of Kim's pre-incident mental health records. Following the standard we outlined in Chambers, 252 N.J. at 589-91, he argued that (1) there is a "substantial, particularized need" for such inspection because Kim's mental illnesses were connected to her ability to "perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate them"; (2) the mental health "information sought is relevant and material" to whether defendant reasonably believed that Kim consented to the sexual acts; and (3) the "information [sought] is not available through less intrusive means." Defendant also supplied the trial judge with medical articles addressing bipolar

---

[3] Ivan also underwent a sworn audio interview with the State in which he explained that Kim contacted him over Facebook Messenger after the assault.

disorder and PTSD. The articles explained that those conditions can produce testimonial incapacities, specifically false memories and an inability to accurately recall or recount events.[4] The State provided the trial judge articles as well, focused on autism and the ability and tendency to lie.[5]

The trial judge conducted oral argument and rendered a comprehensive oral opinion. In exercising his discretion to order an in camera inspection, the judge considered: Kim's mental illnesses; the list of multiple medications she had been prescribed at the time of the incident, including an antipsychotic, Seroquel; Kim's statements to the police, including that she had reported rape on "countless occasions"; Kim's statement to the sexual assault nurse examiner; defendant's statements; the statements from Tamara, Scott, Ivan, and Peggy, which corroborated that Kim had a history of making false accusations of rape and not being truthful; evidence that Kim left Virtua

---

[4] Defendant presented the following articles: Andrea Pozza et al., Post-Traumatic Stress Disorder Secondary to Manic Episodes with Hypersexuality in Bipolar Disorder: A Case Study of Forensic Psychotherapy, 17 Clinical Neuropsychiatry 181 (2020); Henry Otgaar et al., What Drives False Memories in Psychopathology? A Case for Associative Activation, 5 Clinical Psych. Sci. 1048 (2017); Brandon May, Is There a Link Between Bipolar Disorder and Lying?, Med. News Today (May 25, 2023).

[5] The State presented the following articles: Pier Jaarsma et al., Living the Categorical Imperative: Autistic Perspectives on Lying and Truth Telling Between Kant and Care Ethics, 15 Med. Health Care & Phil. 271 (2011); Annie S. Li et al., Exploring the Ability to Deceive in Children With Autism Spectrum Disorders, 41 J. Autism Dev. Disorder 185 (2011).

Memorial Hospital against clinical advice close in time to the incident; Ivan's statement that he believed Kim was not taking her medicine; and the medical articles. In his oral decision, the trial judge stated:

> The discovery provided by the State and the interviews conducted by the Defense investigator with [Kim]'s family members and friends do demonstrate that she has had multiple mental health diagnoses and developmental disabilities that have required multiple hospitalizations.
>
> Also, the substance of the interviews with various family and friends of [Kim], although ultimately that may be left to a question for the jury to consider whether or not [Kim]'s accusations are credible, these interviews with family and friends also are consistent with another with respect to a tendency or a knowledge that these witnesses have of [Kim]'s . . . alleged tendency . . . to lie or to fabricate, including about the very substance of the allegations that she has made against [defendant].
>
> This evidence of pre-incident mental illness establishes certainly, and this Court agrees, by a preponderance of the evidence that there is a substantial particularized need for [Kim]'s pre-incident mental health records.
>
> The information sought from these records most certainly is relevant and material to this case as it may indicate that [Kim] may have a proclivity to imagine or fabricate the alleged sexual assault as well as have a bearing on her ability to perceive, recall or recollect, and most certainly this information is not available through any less intrusive means.
>
> So, this Court agrees while not agreeing fully that any of these records should just be released to the Defense, most certainly the Defense has met its burden for the

10

Court to conduct an in camera review of [Kim]'s pre-incident mental health records.

Accordingly, the trial judge ordered that Kim's pre-incident mental health treatment records limited to Virtua Memorial Hospital and Bergen Regional Medical Center -- her two most recent hospitalizations -- be produced to the trial judge for an in camera review. He explicitly stated that the production of mental health records for in camera review does not mean that those records will automatically be disclosed to defendant following such review.

The State and the New Jersey Crime Victims' Law Center (NJCVLC), on behalf of Kim, filed motions for reconsideration. The trial judge denied the motions and stated in part:

> I still find we have far more than just bald assertions substantiating or meeting the prongs under Chambers. There's certainly substantial particularized need for access to the records because . . . they certainly relate and connect the mental illness of the victim and her ability -- or inability to perceive, recall, or recount the events of the alleged assault perpetrated on her or . . . a proclivity to imagine or fabricate them. So -- and the burden is by a preponderance of the evidence and I'm basing my decision, at least for the in camera review, on a totality of what's before this Court. And certainly, that prong of Chambers has been shown.
>
> It's not just simply because there is a diagnosis of the alleged victim of autism, bipolar I disorder, post-traumatic stress disorder, anxiety, and a variety of medications that she's prescribed, as well as the history both preceding and subsequent to the alleged sexual assault. So, certainly, that prong of Chambers was met.

11

Certainly, the records are relevant and material to the alleged victim's ability to perceive, recall, or recount the alleged assault or . . . proclivity to imagine or fabricate it. Again, <u>it's a totality of what's before the Court</u>. These are more than mere bald assertions, given the history of mental illness . . . which is undisputed by the State, as well as the investigation conducted by the defendant. And <u>it's not lost on me the argument from the State that certain witnesses may have a bias or a reason to lie or fabricate here</u>. But that goes both ways. It's one or the other purposes of conducting an in camera review. It certainly might be a preview of both parties' cases should the matter go to trial. But the records are certainly relevant and material. And certainly, the information in these records is not available through less intrusive means.

. . . .

So, for all the reasons that the Court stated in its initial decision -- initial lengthy oral decision, I am denying the motion for reconsideration by the State, as well as denying the motion independently filed on behalf of [Kim].

[(emphases added).]

The trial judge emphasized that his decision addressed only the first <u>Chambers</u> stage:

I just want to make it clear that just because . . . I'm addressing the threshold issues of the prongs of <u>Chambers</u>, it's not any indication as to whether or not I believe or I found that there is any actual evidence of this. You know, the question is, was that -- was that threshold met under <u>Chambers</u> for the release of the records, at least for an in camera review at this point.

12

> Ultimately, whether or not they're going to be released to counsel, that's a separate issue.

The Appellate Division granted the State and Kim's motions for leave to appeal. The appellate court determined that defendant failed to meet the heightened discovery standard we established in Chambers. It concluded that the trial judge erred by failing to address issues of veracity, reliability, and bias raised by the individual interviews, and therefore abused his discretion by ordering an in camera inspection. Accordingly, the Appellate Division reversed the orders permitting the limited in camera review of Kim's pre-incident mental health records from her two most recent hospitalizations.

We granted defendant's motion for leave to appeal. 261 N.J. 568 (2025). We also granted NJCVLC's motion to file an intervenor brief on behalf of Kim, as well as motions on behalf of the Attorney General, the American Civil Liberties Union (ACLU), and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to appear as amici curiae.

## II.

Defendant argues that the trial judge did not abuse his discretion by ordering the limited and narrow in camera inspection of Kim's pre-incident mental health records. As to the connection between Kim's mental illnesses and her ability to "perceive, recall, or recount the events of the incident" or "imagine or fabricate them," defendant explains that he relies on more than

13

Kim's mental illnesses and prescriptions for psychotropic medications. Specifically, defendant relies on: the fact that weeks before the incident, Kim received mental health treatment at Virtua Memorial Hospital but left against clinical advice; Ivan's statement that he did not believe Kim took her medication; Tamara, Scott, Peggy, and Ivan's statements that Kim had a history of making false statements, including false rape accusations; and medical articles that addressed a link between Kim's mental illnesses, bipolar disorder and PTSD, and testimonial incapacities, specifically false memories and an inability to accurately recall or recount events. Altogether, defendant contends that those pieces of evidence satisfy the preliminary showing required to grant an in camera review of the records.

The State recognizes a defendant's right to a meaningful defense and to secure, where appropriate, an in camera inspection of a victim's mental health records. But it asserts that a motion seeking such an inspection requires affidavits, certifications, or testimony. The State maintains that defendant failed to meet the standard we articulated in Chambers. The NJCVLC, on behalf of Kim, and the Attorney General join the State's arguments. The NJCVLC stresses that because defendant failed to establish the requirements of the preliminary Chambers step, the trial judge's decision was an unwarranted intrusion into Kim's right of privacy.

14

The ACLU argues that the trial judge complied with Chambers and did not abuse his discretion by preliminarily ordering an in camera inspection. It contends that the trial judge made specific findings of fact and rational inferences based on the totality of the record before him and that the Appellate Division improperly substituted its own factual weighing for that of the trial judge. The ACLU points to generally accepted reference sources that connect Kim's diagnoses and medications with how experiences are processed, remembered, or recounted.[6] And it contends Kim exhibited disordered behaviors consistent with the cognitive impairments associated with her mental illnesses and medications. Thus, the ACLU emphasizes that defendant demonstrated some evidential showing that connects the alleged mental illness to the victim's inability to perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate them.

The ACDL argues that defendant produced more than sufficient evidence under the Chambers standard for a preliminary in camera inspection of pre-incident records. It contends that the Appellate Division overlooked the

---

[6] The ACLU cites: Am. Psych. Ass'n, Diagnostic & Stat. Manual of Mental Disorders (DSM-5-TR) (5th ed. 2022); Kaplan & Sadock, Comprehensive Textbook of Psychiatry (11th ed. 2024); and Physicians' Desk Reference (71st ed. 2017). The PDR is no longer issued as a physical book and has transitioned entirely to a digital format known as the Prescribers' Digital Reference (PDR.net), which is continuously updated online.

peer-reviewed articles that connect Kim's diagnoses with tendencies toward misperceiving events or falsifying facts; erred by focusing on credibility issues, even though the State did not dispute Kim's medical conditions and medication use; and discounted the statements by Ivan, Tamara, Scott, and Peggy, which were consistent with each other and with Kim's own testimony.

III.

An appellate court "generally defer[s] to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." State v. Knight, 256 N.J. 404, 415 (2024) (quoting State v. Brown, 236 N.J. 497, 521 (2019)). "An abuse of discretion occurs by making decisions 'without a rational explanation, [that] inexplicably depart[] from established policies, or [that] rest[] on an impermissible basis.'" Chambers, 252 N.J. at 594-95 (first and third alterations in original) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). Reviewing courts, however, "need not defer . . . to a discovery order that is well 'wide of the mark,' or 'based on a mistaken understanding of the applicable law.'" Knight, 256 N.J. at 416 (quoting State v. Hernandez, 225 N.J. 451, 461 (2016)). A trial court's legal conclusions are reviewed de novo. State v. Bullock, 253 N.J. 512, 515 (2023).

16

## IV.

"[A] heightened discovery standard governs a defendant's motion for pre-incident mental health records from a sexual assault victim." Chambers, 252 N.J. at 571. The standard is rigorous due to the need to balance a criminal defendant's constitutional right to "a meaningful opportunity to present a complete a defense," State v. Budis, 125 N.J. 519, 531 (1991) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)), against the significant privacy interests of sexual assault victims, State v. D.R.H., 127 N.J. 249, 259 (1992).

In Chambers, we held that "a defendant is entitled to present a meaningful defense by making a good-faith request for pre-incident mental health records of a sexual assault victim." 252 N.J. at 589. To obtain such records, the defendant must satisfy a two-stage standard: first, the trial judge must make a preliminary gatekeeping determination as to whether there is sufficient justification to warrant an in camera review; and second, if the defendant meets "that heavy preliminary burden," the judge will conduct a substantive in camera inspection to determine whether production to the defendant is warranted. Id. at 571.

"If a defendant files a motion seeking access to pre-incident mental health records, a victim is entitled to notice by the county prosecutor's office and must have an opportunity to be heard, with or without independent

17

counsel." Id. at 589. Here, Kim did not initially receive notice of the motion. The record is unclear as to precisely when Kim was eventually notified; we discern that it was at some point before she joined the State's motion for reconsideration. We take this opportunity to remind the State of its duty to provide timely notice to a victim whenever a defendant files a Chambers motion, and to remind trial judges of their obligation to ensure -- at the onset of the hearing -- that the victim has received both notice and an opportunity to oppose the motion, as required by the Crime Victims' Bill of Rights, N.J.S.A. 52:4B-36(r).

The first Chambers stage requires a defendant to show, by a preponderance of the evidence, that: (1) the defendant has "a substantial, particularized need" for the records; (2) "the information sought [therein] is relevant and material;" and (3) "the information is not available through less intrusive means." Id. at 590. If a defendant satisfies that three-part discovery standard, then the defendant is entitled to have the trial judge conduct an in camera inspection. Id. at 591. During the second stage, the judge must determine whether to "pierce" the applicable mental health privilege, redact the records, and make them available under a protective order. Id. at 592.

At issue here is the first stage: whether defendant is entitled to have the trial judge conduct an in camera inspection of the records. We now review

18

whether the record supports the trial judge's finding that defendant established the three prongs of <u>Chambers</u>' first stage by a preponderance of the evidence.

A.

As we held in <u>Chambers</u>,

> [t]o establish a substantial, particularized need for access to mental health records, there must be some evidential showing that connects the alleged mental illness to the victim's inability to perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate them -- the sole permissible purpose for which access may be granted.
>
> [<u>Id.</u> at 590.]

Some persuasive evidential showing must exist to establish substantial need. <u>Ibid.</u> "[G]eneralized statement[s]," such as allegations the victim is "crazy," are "insufficient to establish the need for the records." <u>Ibid.</u> Moreover, access is not justified if it was sought "in the hopes of impeaching a victim with inconsistent statements." <u>Ibid.</u>

In some cases, an evidential showing "may . . . include opinions from mental health experts." <u>Ibid.</u> But such experts are not required. We note that affidavits, certifications, and testimony are also not required to meet the threshold of "some persuasive evidential showing to establish substantial need." <u>Ibid.</u> In addition, a defendant is not required to show exactly what the medical records will contain in order to satisfy the threshold for a judge to

19

conduct an in camera review. Because a defendant will not have seen the records, such a showing would be impossible.

Here, defendant's proffered evidence includes: (1) Kim's statement to the sexual assault nurse examiner; (2) Kim's statement to police; (3) messages between Kim and Ivan; (4) interviews with Kim's friends and family members; and (5) medical literature discussing the connection between Kim's mental illnesses and false memories or a proclivity to fabricate.

We review defendant's proffered evidence in turn.

1.

Kim reported to the sexual assault nurse examiner that she has received diagnoses of bipolar I, autism, PTSD, and anxiety. The parties do not dispute those diagnoses. At the time of the alleged sexual assault, Kim had active prescriptions for various psychotropic medications, including Seroquel, lithium, trazadone, Vistaril, and Lamictal. Seroquel is an antipsychotic, and the fact that a physician prescribed it to Kim may indicate that Kim has experienced issues with perception and psychosis.[7]

Kim also reported to the sexual assault nurse examiner a detailed description and recollection of the alleged assault. Regarding ejaculation, Kim

---

[7] Physicians' Desk Reference, 1028-30 (71st ed. 2017) (explaining that Seroquel is an "atypical antipsychotic," and can be used to treat schizophrenia, bipolar I disorder, and major depressive disorder).

20

stated she was unsure if ejaculation had occurred, which contradicts her earlier statement to Ivan that defendant had ejaculated onto her.

2.

In her sworn statement to police, Kim described the alleged assault in detail. When asked if defendant had ejaculated, she responded that she did not know and "wouldn't have known what to look for," also contradicting her previous statement to Ivan. Kim additionally told detectives that she made allegations of rape "on countless occasions," and that her father always believed her.

In her conversation with law enforcement, Kim repeatedly described herself as someone who was in foster care her whole life. Specifically, Kim explained that she was in foster care until she aged out of the system when she turned eighteen. Kim, however, was adopted at age four, and aside from her stays at psychiatric facilities, lived with her adoptive mother and father until she was eighteen.

3.

In her messages with Ivan, Kim stated that her father would not believe her about the alleged assault, contradicting her statement to the police that her father always believed her. We emphasize that Kim's credibility is not part of the analysis under <u>Chambers</u> and is ultimately a question for a jury. Moreover,

21

her statements that her claims may not be believed does not reflect on their ultimate veracity -- we are cognizant that sexual assault victims may be hesitant to report assaults due to concerns about being believed. Kim's statement that her father would not believe her may be considered only insofar as it contradicts a subsequent statement and may, when reviewed with other evidence, support that Kim's mental illnesses may impair her ability to perceive, recall, or recount events.

Kim also told Ivan that defendant had ejaculated onto her. This contradicts the statements she made to the sexual assault nurse examiner and the police. We recognize that victims of sexual assault and other violent crimes often struggle to recall details of the incident. Some victims may remember certain aspects with remarkable clarity, while others may remember the assault in fragments or may forget significant portions altogether. The presence of conflicting statements may reflect the trauma and emotional distress experienced by the victim, rather than intentional fabrication or deception. Such inconsistencies, standing alone, do not prove a substantial need, but they may be considered in conjunction with other evidence to evaluate whether defendant has demonstrated a substantial, particularized need for the records.

4.

Tamara, Scott, Ivan, and Peggy informed investigators that Kim had been admitted to several psychiatric hospitals. A few weeks before the incident, Kim had been receiving psychiatric treatment at Virtua Memorial Hospital. She left that hospital against clinical advice, and it is unclear whether Kim was medication-compliant at the time of the alleged assault.

According to Tamara and Scott, Kim boasted about making false rape accusations against men she knows or has dated. When Scott asked Kim why she would do that, Kim replied, "[T]hat's how I am." In addition, Ivan, Kim's former boyfriend and then-best friend, described her as someone who "tends to lie a lot." Kim's adoptive mother similarly admitted that "it is hard to believe what [Kim] says sometimes." And Tamara explained that Kim fails to appreciate the consequences of lying on account of her mental illnesses.

The interviews of Kim's family and friends are all consistent in their descriptions of Kim, her mental illnesses, and her history of treatment. The interviews are also consistent with Kim's own sworn statement that she had made prior allegations of rape on "countless occasions." The Appellate Division's concern that the interviews raised issues of hearsay, veracity, reliability, and bias is well-founded, but misplaced in this context. The trial judge correctly recognized that the interviews presented such issues, but also

23

that they should be considered in totality with the other evidence, that their admissibility at trial is a separate issue from the <u>Chambers</u> analysis of when a trial judge may grant an in camera inspection of records, and that credibility is ultimately a question for a jury. We are persuaded that, when viewed alongside the other record evidence, the trial judge did not abuse his discretion in finding that the interviews provided more than "bald assertions" that Kim has a history of making false representations, which may be connected to her mental illnesses.

5.

The medical literature cited by defendant indicates that the mental conditions with which Kim has been diagnosed can produce the types of testimonial inconsistencies Kim has demonstrated. Defendant acknowledges that Kim's "inconsistent statements may not be the product of intentional fabrication" because "individuals with PTSD and bipolar disorder can experience false or disturbed memories." The peer-reviewed articles defendant submitted support the conclusion that Kim's specific diagnoses may influence how she processes, remembers, and recounts experiences.

For example, the peer-reviewed article, <u>What Drives False Memories in Psychopathology? A Case for Associative Activation</u>, outlined how "PTSD, a history of trauma, and depression are strongly linked to false memory

24

vulnerability." Henry Otgaar et al., <u>What Drives False Memories in Psychopathology? A Case for Associative Activation</u>, 5 <u>Clinical Pysch. Sci.</u> 1048, 1049 (2017). Accordingly, the study cautioned that sexual assault victims' "testimony can be plagued by memory aberrations, ones that could end up in false accusations and wrongful convictions." <u>Ibid.</u> This vulnerability is heightened when individuals with those conditions are presented with emotional material (e.g., trauma stimuli) that goes to the heart of their psychopathology. <u>Ibid.</u> The article specifically noted that "depressed individuals are particularly prone to the formation of negatively valenced or depression-related false memories." <u>Id.</u> at 1053.

The literature also indicates that individuals who are diagnosed with bipolar disorder in addition to PTSD may experience exacerbated symptoms. Andrea Pozza et al., <u>Post-Traumatic Stress Disorder Secondary to Manic Episodes with Hypersexuality in Bipolar Disorder: A Case Study of Forensic Psychotherapy</u>, 17 <u>Clinical Neuropsychiatry</u> 181 (2020). The report details how bipolar disorder is a chronic condition, for which drug treatment is fundamental. <u>Id.</u> at 184. But, according to that report, reduced compliance with drug therapy is commonly observed in patients with bipolar disorder. <u>Id.</u> at 186. The report also describes how hypersexuality is a symptom of the

25

manic phase of bipolar disorder and that behaviors during hypersexual episodes may result in PTSD. Id. at 184, 186.

The State submitted two peer-reviewed articles addressing autism and the ability to lie. The first article explained that children with autism spectrum disorder (ASD) "seem less able to deceive." Pier Jaarsma et al., Living the Categorical Imperative:  Autistic Perspectives on Lying and Truth Telling Between Kant and Care Ethics, 15 Med. Health Care & Phil. 271, 272  (2011). But the second article, published the same year, found that "higher-functioning children with ASD are able to tell lies of their own volition." Annie S. Li et al., Exploring the Ability to Deceive in Children with Autism Spectrum Disorders, 41 J. Autism Dev. Disorder 185, 192 (2011). Children with this condition, the article noted, struggle to "cover[] up their lie by maintaining consistency between their initial lie and subsequent statements." Id. at 186. Additionally, those articles relate to only one of Kim's diagnoses. And they do not indicate that children with ASD cannot lie -- rather, the articles report that children with ASD have difficulty maintaining their lies. This distinction is significant because the issue here is not merely Kim's ability to fabricate, but Kim's ability to recollect past events. Accordingly, although the State's articles provide some insight into the relationship between ASD and deception,

26

they do not undermine the broader connection defendant established between Kim's diagnoses and her testimonial inconsistencies.

Overall, the peer-reviewed articles defendant submitted demonstrate a connection between Kim's diagnoses -- bipolar I, PTSD, autism, and anxiety -- and her ability to perceive, recall, or recount the events of the alleged assault as well as a proclivity to imagine or fabricate. The articles highlight the complex interplay between the conditions with which Kim has been diagnosed and her capacity to accurately recall and recount past events.

\* \* \*

Reviewing the record as a whole, we discern no abuse of discretion with the trial judge's determination that defendant established, by a preponderance of the evidence, a connection between Kim's pre-incident mental health conditions and her inability to perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate the alleged assault.

Reviewed in its entirety, defendant's proffered evidence shows: Kim has specific mental illness diagnoses; Kim received treatment for her mental illnesses at several psychiatric facilities; Kim checked out of the most recent facility against medical advice; Kim is prescribed medication for her mental illnesses; Kim may not have been medication-compliant at the time of the alleged assault; Kim's friends and family describe her as having "a tendency to

27

lie" and as someone who, due to her mental illnesses, may not appreciate the consequences of lying; Kim demonstrated an inability to accurately recount past events; Kim provided conflicting accounts regarding details of the alleged assault; and Kim's mental illnesses can produce the types of testimonial incapacities she has demonstrated.

As defense counsel acknowledged at oral argument, if each piece of evidence was viewed on its own, it would not constitute a substantial, particularized need. But we do not look at each piece in a vacuum -- we analyze how each piece of evidence relates to another to determine whether a defendant has shown, by a preponderance of the evidence, Chambers' requisite connection between the victim's mental illness and the purported testimonial incapacity.

Here, collectively, the evidential record amounts to more than bald assertions that Kim's mental illnesses may affect her ability to perceive, recall, or recollect the assault, or may indicate a proclivity to fabricate it. Accordingly, defendant established a substantial and particularized need for Kim's pre-incident mental health records and thereby satisfied the first prong of the Chambers analysis.

B.

The second prong requires defendant to prove that the information sought is both relevant and material. Chambers, 252 N.J. at 590. "To be relevant, the alleged mental illness of a sexual assault victim must have a 'tendency in reason to prove or disprove' an ability to perceive, recall, or recount the alleged assault, or a proclivity to imagine or fabricate it." Id. at 591.

The question of materiality turns on "the relation between the propositions that the evidence is offered to prove and the issues in the case." State v. Williams, 240 N.J. 225, 236 (2019) (quoting 1 McCormick on Evidence § 185, at 994 (7th ed. 2013)). "A material fact is one which is really in issue in the case." Chambers, 252 N.J. at 591 (quoting State v. Buckley, 216 N.J. 249, 261 (2013)). "Just as a victim's general ability to perceive, recall, or recount an alleged assault may be relevant evidence of a victim's alleged mental illness, it may be material to the limited extent that it calls into question the accuracy of a victim's version of events or, more fundamentally, whether the events that a victim alleges even took place." Id. at 591.

The central question in this case is whether defendant reasonably believed that Kim freely and affirmatively consented to engage in sexual

29

activity with him. The credibility of Kim's versions of events is therefore critical to resolving that issue.[8]

In ordering an in camera inspection, the trial judge reasonably relied on interviews from individuals who had intimate knowledge of, and experiences with, Kim. From that evidence, the trial judge drew a rational inference that Kim's pre-incident mental conditions could affect her ability to perceive, recall, or recount, as well as her tendency to imagine or fabricate the alleged assault. Because the trial judge's credibility determinations were based upon

---

[8]    We disagree with the dissent's conclusion that defendant's statements "negate the very basis upon which he claims those records are relevant and material, and that he has a substantial and particularized need for them." See post at ___ (slip op. at 7). The Chambers factors are meant to be a threshold showing, not an invitation for resolution of ultimate guilt. Requiring a judge, during discovery, to resolve factual disputes and determine whose account is more credible -- rather than simply assessing whether the defendant has met the three Chambers factors -- would devolve into a he-said/she-said dispute -- the precise type of evil Chambers was intended to guard against. The ultimate determination of credibility belongs to the factfinder, after discovery is complete and the record is fully developed.

Even considering defendant's statements to the police, Kim's pre-incident mental conditions are relevant and material to her ability to perceive, recall, or recount, as well as her tendency to imagine or fabricate the alleged assault. In applying the Chambers standard, the focus must remain on whether the defendant has provided specific, credible evidence linking the victim's mental health to her ability to testify reliably, rather than on the defendant's account of the events. Such statements -- particularly those relating to consent -- are considered only in assessing whether the defendant has made a good faith showing under Chambers.

credible record evidence, the judge did not abuse his discretion in concluding that defendant showed that the information sought is relevant and material.[9]

The Appellate Division erred by substituting its own assessments for those of the trial judge and by disturbing the trial judge's factual determinations as to the interviewees. Although the Appellate Division correctly noted that the interview summaries might present future credibility and evidential challenges, under N.J.R.E. 101(a)(3)(E), a trial judge may relax the rules of evidence at proceedings to determine the admissibility of evidence. Accordingly, because the record shows that information sought from the records may indicate that Kim has a proclivity to imagine or fabricate the alleged assault, the information is relevant and material to defendant's defense.

### C.

Finally, under the third prong, defendant must demonstrate by a preponderance of the evidence that the information sought is not available through less intrusive means. Chambers, 252 N.J. at 591. Here, in contrast to Chambers, where we suggested that the defense could "probe more about whether family members and friends have additional knowledge of the

---

[9] We stress that relevance and materiality in this context are not determinative as to whether that same evidence meets N.J.R.E. 403 and is thus admissible at trial. See Chambers, 252 N.J. at 593 n.5. Simply put, a judge's decision that a defendant is entitled to an in camera review of the records does not amount to a definitive evaluation of the evidence's probative value.

victim's alleged mental illness," defense counsel has already interviewed those who have information related to Kim's mental conditions. Id. at 596. Even with that information, defendant has demonstrated gaps in the evidence as to Kim's mental illnesses and treatment. Particularly, there is no documentation available to defendant regarding Kim's actual diagnoses or the types of medication doctors prescribed to Kim beyond her self-reported statements, whether Kim took those medications, her stays at the various psychiatric facilities, and whether Kim exhibited a propensity to fabricate or an inability to recall or remember events. Because the only way for defendant to reliably obtain such information is through Kim's pre-incident mental health records, defendant has sufficiently established that the information sought is not available by less intrusive means. The scope of records to be produced for the trial judge's in camera review is limited and narrow -- only records from Kim's two most recent hospitalizations at Virtua Memorial Hospital and Bergen Regional Medical Center will be available for inspection.

*   *   *

On this record, the trial judge did not err in finding that defendant demonstrated a substantial, particularized need for Kim's pre-incident treatment records, that the records are relevant and material, and that the

32

information could not be secured from a less intrusive source.  Accordingly, the trial judge did not abuse his discretion in granting an in camera review.

V.

We reiterate that this case concerns only the initial stage of the Chambers analysis.  The Chambers framework is intentionally structured to impose increasing burdens on defendants as they progress from stage one to stage two, thereby aligning the degree of intrusion with the protection due to the alleged victim's privacy rights.  See id. at 593.  The first stage -- determining whether a defendant is entitled to an in camera review of a victim's medical records -- is thus a distinct analytical framework from whether the records must ultimately be produced to the defendant after the second Chambers stage.

At the second stage, for a defendant to receive the records, the trial judge must first conduct an in camera review to address whether the mental health privilege should be pierced, applying the standard set forth in N.J.R.E. 534.  Thereafter, if "the judge determines that the records, as redacted, are discoverable . . . then, solely for discovery purposes, the records should be produced under a protective order to be approved by the judge, with an opportunity for interlocutory appellate review before disclosure occurs."  Ibid.

Here, at this first stage, neither the issue of whether to "pierce" the mental health privilege nor issues related to admissibility at trial are before us. The trial judge correctly noted the different Chambers stages, emphasized that the question before him was whether defendant satisfied the first Chambers stage, and only found that defendant had met the preliminary threshold. He expressly acknowledged that this preliminary determination does not mean that defendant will automatically be entitled to the mental health records.

Accordingly, having determined that defendant satisfied the preliminary showing, the trial judge may now engage in an in camera review of the records. If the judge determines that the records contain relevant material and that the mental health privilege should be pierced, Kim will be afforded an opportunity to challenge those findings.

## VI.

Successfully establishing, by a preponderance of the evidence, that an in camera review of an alleged sexual assault victim's pre-incident mental health records is warranted is not an easy task. As we held in Chambers, "[t]he greater the intrusion into one's privacy, the higher the burden a defendant must show for the information sought." Id. at 587. Under Chambers, requests for an alleged sexual assault victim's pre-incident mental health records "should remain rare." Id. at 571. This is one such rare case. On this record, we

34

discern no abuse of discretion in the trial judge's determination that defendant made a sufficient preliminary showing to obtain an in camera inspection.

The judgment of the Appellate Division is reversed and the trial judge's order granting a limited and narrow in camera review of the records is reinstated.

JUSTICES PATTERSON, WAINER APTER, NORIEGA, and HOFFMAN join in JUSTICE FASCIALE's opinion. JUSTICE PIERRE-LOUIS filed a dissent, in which CHIEF JUSTICE RABNER joins.

35

State of New Jersey,

Plaintiff-Respondent,

v.

R.F.P.,

Defendant-Appellant.

_____

K.S.,

Intervenor-Respondent.

JUSTICE PIERRE-LOUIS, dissenting.

In this case, defendant gave a statement to police that, during the alleged sexual assault of his niece, Kim, she sent him "mixed signal[s]" and said "stop" at least once; and when asked by an officer, "You knew it was not consensual, right?" defendant responded, "Yes." Defendant also corroborated many of the details Kim reported. Yet, defendant now moves for access to Kim's mental health records based on a "good faith" belief that her mental health conditions potentially affect Kim's ability to accurately perceive events and truthfully relay information. And the majority states that under the facts of this case, defendant's own "statements are not relevant to [the Court's] analysis [under State v. Chambers, 252 N.J. 561 (2023),] in determining

1

whether defendant is entitled to a limited and narrow in camera review of the [victim's medical] records." Ante at ___ n. 2 (slip op. at 5 n.2).

In my view, the fact that defendant stated in his own words that Kim did not imagine or falsify what transpired during the alleged sexual assault undermines the relevance and materiality of Kim's confidential records regarding whether her mental health conditions affect her perception and accuracy. And failure to consider that statement undermines the delicate balancing of defendants' and victims' rights this Court established in Chambers. Because I believe the totality of the information -- including any admissible statements by the defendant -- must be considered in conducting a Chambers analysis, I respectfully dissent.

## I.

Defendant stands accused of sexually assaulting Kim, his developmentally disabled[1] 18-year-old niece.[2] After Kim accused defendant of

---

[1] Kim self-reported being autistic and her adoptive mother confirmed that Kim had many "learning disabilities and challenges." In describing his niece, defendant stated that she is "hyper activ[e]" and likes to wrestle with people. He noted, "[y]ou know how autistic kids are when you play with them" in reference to his niece "get[ting] happy when you play around with her."

[2] Defendant has also been charged with obstruction of the administration of justice, hindering, and fabricating physical evidence for allegedly fabricating apology messages from Kim. Defendant provided his attorney with three emails purportedly from Kim to defendant in which Kim supposedly apologized to defendant for lying and stated that she wanted to drop the

sexual assault, family and friends alike advised law enforcement that Kim suffers from mental health conditions and is prone to lying, specifically about being sexually assaulted.[3]  Kim self-reported that she has autism and suffers from bipolar I disorder and anxiety, as well as other physical ailments like asthma and seizures.

Defendant moved for an in camera review of Kim's mental health records pursuant to Chambers to determine whether those records shed light on her capacity "to accurately perceive events and truthfully relate information," notwithstanding defendant's own statements that corroborate much of Kim's allegations regarding the alleged assault.  The majority finds that defendant has made a sufficient showing under Chambers to get an in camera review of Kim's mental health records and that his statement to police is not relevant to the analysis in this case.  Ante at ___, ___ n.2 (slip op. at 3, 5 n.2).  I disagree.

---

charges against him.  According to the State, after receiving the emails from defense counsel with a request to dismiss the indictment, the State's investigation revealed that the IP address from which the emails were sent matched defendant's IP address and originated from an account opened on the date the first email was sent and closed on the date the last email was sent. This led the State to seek and obtain a superseding indictment against defendant for obstruction, hindering, and fabrication of evidence.

[3]  One of those family members was Kim's aunt, who also lived at the same residence where the alleged sexual assault took place.  After Kim reported the sexual assault, her aunt allegedly physically assaulted her and was charged with simple assault.

3

Pursuant to this Court's opinion in Chambers, a defendant seeking pre-incident mental health records of an alleged sexual assault victim must "make three showings: (1) that there is a substantial, particularized need for such access; (2) that the information sought is relevant and material; and (3) that the information is not available through less intrusive means." 252 N.J. at 590. If a defendant satisfies all three prongs, they are entitled to have a judge conduct an in camera inspection of the alleged victim's mental health records as the first step in a process that might later result in all or a portion of those records being released to the defendant. Id. at 591-92.

The majority states that "the weight of the prosecution's evidence, including defendant's own statements, is for the jury to resolve. . . . Under the totality of the facts of this case, . . . his statements are not relevant to our analysis in determining whether defendant is entitled to a limited and narrow in camera review of the records." Ante at ___ n.2 (slip op. at 5 n.2). I believe defendant's statement should potentially be considered. In sexual assault cases, where the most common defenses are that the victim is lying and that the sex was consensual, a defendant's admissible statements must play a role in the Chambers analysis because ultimately, after in camera review, the court will consider whether to pierce the mental health provider-patient privilege.

4

While it is, of course, true that the ultimate question of whether the State has met its burden of proving defendant is guilty beyond a reasonable doubt rests with the jury, the weight of the evidence is certainly a factor that can be considered by a trial court, for limited purposes, during the preliminary stages of a prosecution. One example is during a trial court's consideration of pretrial detention. The Criminal Justice Reform Act articulates that one of the factors trial courts "may take into account" in pretrial detention hearings, along with the nature and circumstances of the offense and the history and characteristics of the defendant, is "[t]he weight of the evidence against the eligible defendant, except that the court may consider the admissibility of any evidence sought to be excluded." N.J.S.A. 2A:162-20(b). In other words, during a pretrial detention hearing -- one of the most preliminary procedures that follow an arrest -- trial courts are statutorily allowed to take into account the weight of the evidence against a defendant and, in doing so, may consider the admissibility of any evidence the defendant seeks to keep out.

I think similar consideration should be given to a defendant's statement or any other evidence in a sexual assault case that would negate the relevance, materiality, or substantial need for the mental health records of an alleged victim under <u>Chambers</u>. Defendant was indicted over five years ago on February 21, 2021, followed by a superseding indictment over three years ago

5

on March 15, 2023.  Defendant moved to compel discovery of Kim's mental health records in August 2023, eight months after this Court's decision in Chambers.  As of this writing, defendant has yet to move for suppression of his statement.  He might still seek to do so.  And just like trial courts are allowed to consider the weight of the evidence against a defendant seeking their liberty at the pretrial detention stage, this Court should allow for the consideration of such evidence, and its potential exclusion, in a Chambers analysis.

It is and will quite often be the case that the assessment of relevance and materiality in a criminal case will turn on the totality of information and evidence before the court.  I do not think our courts should be directed to ignore evidence that in some instances might negate any relevance or materiality that a victim's mental health records might have under a Chambers analysis.  Instead of turning a blind eye to such evidence, this Court should enhance the balanced protections we articulated in Chambers and formulate a mechanism pursuant to which evidence bearing on the court's assessment of the Chambers factors can be considered.[4]

---

[4] Such a procedure could involve the trial court, after receiving a motion for a sexual assault victim's mental health records and opposition from the State based on certain evidence, inquiring whether defendant will seek to exclude the evidence upon which the State bases its opposition.  If not, and the evidence comes in, the trial court should consider that evidence in its Chambers analysis.  If the defense will move to suppress certain evidence the State deems relevant to the Chambers analysis, the trial court can stay its

If the goal of Chambers was to balance both victims' and defendants' rights, we need to weigh all the information before the court in assessing whether defendant meets all three Chambers factors. Such balancing cannot be achieved if courts disregard material evidence that might make the victim's mental health records inconsequential. At trial, even if defendant's statement is admitted, the jury absolutely gets to decide whether he is guilty beyond a reasonable doubt.[5] But at this preliminary stage, on this important issue of protecting a victim's rights and potentially taking the extraordinary step of piercing the mental health privilege, we should allow for consideration of the totality of evidence before the court.

Here, if defendant's statement is admissible, his own words negate the very basis upon which he claims those records are relevant and material, and that he has a substantial and particularized need for them.

---

decision on the Chambers motion until after its decision on the motion to suppress has been made. Such a procedure would not be overbearing considering, as we stated in Chambers, our expectation that these motions for sexual assault victims' mental health records will be rare.

[5] I agree with the majority that "[t]he Chambers factors are meant to be a threshold showing, not an invitation for resolution of ultimate guilt." Ante at ___ n.8 (slip op. at 29 n.8). As noted above, I acknowledge that the ultimate question of guilt is decided by the jury. Again, I believe the totality of the evidence, including defendant's admissible statements, should be considered for the limited purpose of assessing whether he has made a threshold showing for an in camera review of the victim's mental health records under Chambers.

7

The majority lists the many items of evidence defendant presented in support of his motion for Kim's mental health records including her statement to the sexual assault nurse examiner (SANE),[6] her self-reported mental

[6] Defendant argues, and the majority opinion states, that Kim contradicted herself in telling the SANE nurse that she was not sure whether defendant ejaculated because she previously told her ex-boyfriend Ivan in Facebook messages that he did ejaculate on her. See ante at ___ (slip op. at 20-21). The State, however, disagrees with defendant's characterization of Kim's messages with Ivan. In those messages, the following exchange occurred when Kim told Ivan that her uncle sexually assaulted her:

> Ivan:  He raped someone?
> If he did and u want to proof it find out who he did it to
>
> Kim:  He did it to me and told me that I can't tell anyone
>
> Ivan:  WTF
>
> Kim:  I don't know what to do
>
> Ivan:  Were u that horny?  Or was he?
>
> Kim:  My dad won't believe me
>
> Ivan:  Sigh. . .
>
> Kim:  He came on me

The State argues that Kim's message, "He came on me," appears to be in response to Ivan's questions, "Were u that horny?  Or was he?," and Kim possibly meant to type "He came onto me."  The State argues that this reading of the messages make sense in context and comports with Ivan's statement to police that Kim did not provide him with any additional details about the sexual assault.  Regardless, defendant himself confirmed during his statement that he ejaculated, first stating he did so inside the victim, then later stating "mostly on a tissue, but some went in her."

illnesses, statements from friends and family members about her mental illnesses and proclivity to fabricate, and medical literature purportedly connecting Kim's mental illnesses with false memories or an inclination to lie. Ante at ___ (slip op. at 20). The amount of evidence proffered by defendant is surely more than that offered by the defendant in Chambers, where the defendant simply offered that the alleged victim "went crazy" before.[7] 252 N.J. at 575.

Although I agree that defendant has put forth a lot of evidence in support of his motion, I disagree on the import of this volume of evidence. Our Chambers standard is not a numbers game and was never intended to be so. Assessing whether a defendant gets an in camera review is not a matter of counting up how many witnesses, or statements, or articles show that the alleged victim might have the inclination to lie as a result of his or her mental illness. Chambers articulated three specific factors that must be met, regardless of how many witnesses a defendant lines up.

In prongs one and two in particular, defendant must show that he has a substantial, particularized need for access to the records and that the mental

---

[7] It bears noting that even in Chambers, the victim recorded a phone call with the defendant in which defendant apologized and threatened to kill himself over the alleged sexual assault, arguably admitting to committing the act. 252 N.J. at 573-74.

9

health records are relevant and material.  See id. at 590.  In my view, defendant fails both of those prongs.

I begin with prong two, a showing of relevance and materiality.  In his supplemental brief, defendant clarified that he "moved for in camera review on a good faith belief that Kim's account of the alleged assault is not credible because her mental illness affects her ability to accurately perceive events and truthfully relate information."  (emphasis added).  I agree with amicus Attorney General's argument that the materiality of Kim's mental health records should be considered based on the totality of evidence before the court, including defendant's own statement.  Defendant claims to need access to Kim's mental health records based on a good faith belief that her mental illness affects her ability to accurately perceive events and relate information, but defendant's own statement to police belies that purported good faith belief because defendant corroborated the large majority of information Kim relayed to police about the alleged sexual assault, including her statement that she did not consent.

In response to questions from police, Kim described the alleged sexual assault in painstaking detail.  She told investigators that the alleged sexual assault occurred in the bedroom her father shared with defendant.  Defendant confirmed this location.  Kim also told investigators that she went into the

10

room to look for her cat. After initially claiming he "had no clue" why Kim entered his bedroom, defendant later admitted that Kim went into the room to look for her cat. Kim stated that defendant kissed her forehead, then her lips, then her breasts, where he then began sucking on her breasts, and also touched her vagina. Defendant stated that he kissed her forehead, sucked and bit her nipples, and touched her vagina. Kim further claimed that defendant performed oral sex on her; defendant confirmed that he did so. Kim also gave additional details like the fact that defendant did not pull his pants all the way down when he penetrated her, and defendant confirmed that his shorts were not down and that he pulled his penis out through the zipper area. Kim also told police that after the alleged assault, defendant advised her, "[D]on't tell your dad. He won't believe you anyway," and defendant confirmed he told her, "[D]on't tell your dad."

Regarding the issue of affirmative and freely given consent, Kim told investigators that she tried sliding off the bed at one point, but defendant stopped performing oral sex on her and moved her back onto the bed. Defendant confirmed that Kim made some type of movement "[o]ne or two times" to get away. And although defendant initially stated that Kim "never said no," "never said stop," and "wasn't forced," he later admitted to police that she said "stop" at least once and possibly more times. Defendant also

11

stated that "she was the one who . . . sent mixed wires . . . . [Y]ou're a guy you know how [unintelligible] . . . when they send mixed signals."[8]

In light of defendant's own words, which corroborated many of Kim's allegations, I think it would be difficult to find, if defendant's statement is admissible, that defendant has a substantial and particularized need for Kim's mental health records and that the mental health records are relevant and material due to defendant's "good faith belief that Kim's account of the alleged assault is not credible because her mental illness affects her ability to accurately perceive events and truthfully relate information." Defendant, through his statement, has already confirmed that Kim had the ability to perceive the events and accurately relate the information regarding the alleged sexual assault. Even if Kim has lied every day of her life about everything and anything, it is of no consequence because defendant has stated in his own words that she did not lie this time.

Defendant's statements, if admissible, corroborate the majority of Kim's version of the incident and disclaim defendant's "good faith" need for her mental health records. This makes the records irrelevant and immaterial,

---

[8] Under New Jersey's sexual assault statute, "[a]ny act of sexual penetration engaged in by [a] defendant without the affirmative and freely-given permission of the victim to the specific act of penetration constitutes the offense of sexual assault." State in Int. of M.T.S., 129 N.J. 422, 444 (1992); N.J.S.A. 2C:14-1(c), -2.

12

which would fail prong two of the <u>Chambers</u> standard. Because the evidence would be immaterial and irrelevant, defendant would also fail prong one because he would have no substantial need for information that is irrelevant and immaterial to the case. If defendant's statement is deemed admissible, his pursuit of Kim's mental health records, in my view, would amount to simply "[s]eeking [the] records in the hopes of impeaching [the] victim," which we stated in <u>Chambers</u> "will never justify access." 252 N.J. at 590.

## II.

Over three decades ago, this Court established affirmative and freely given consent as the standard in sexual assault cases. <u>M.T.S.</u>, 129 N.J. at 444. In that important decision, the Court "conducted an extensive examination of the history of rape laws throughout the country, particularly the stigma that has historically been attached to alleged victims." <u>C.R. v. M.T.</u>, 248 N.J. 428, 442 (2021). Indeed, "[c]ourts and commentators historically distrusted the testimony of victims, 'assuming that women lie about their lack of consent for various reasons: to blackmail men, to explain the discovery of a consensual affair, or <u>because of psychological illness.</u>'" <u>M.T.S.</u>, 129 N.J. at 433 (emphasis added) (quoting Cynthia Ann Wicktom, Note, <u>Focusing on the Offender's Forceful Conduct: A Proposal for the Redefinition of Rape Laws</u>, 56 <u>Geo. Wash. L. Rev.</u> 399, 403 (1988)).

13

In order to be faithful to the careful balance Chambers struck between victims' and defendants' rights, courts must be able to consider all potentially admissible evidence like a defendant's own statement. If not, finding that a defendant meets the Chambers standard because a victim has mental illnesses and those illnesses can potentially affect a person's ability to accurately perceive events and truthfully relay information, without even considering evidence that the victim in the specific case seems to have no trouble accurately perceiving events, would continue the historical distrust of victims with psychological illnesses that this Court cautioned against in M.T.S.

I agree with Kim's counsel that if an in camera review is allowed in this case, motions for a victim's mental health records will not be "rare" as we presumed in Chambers. Such motions would be commonplace. And victims, who are already hesitant to report sexual assaults, will be even more reluctant to come forward knowing their mental health records might have to be produced on account of their diagnosed mental illness. See Rachael Goodman-Williams et al., Reasons for Not Reporting Among Sexual Assault Survivors Who Seek Medical Forensic Exams: A Qualitative Analysis, 39 J. of Interpersonal Violence 1905, 1907 (2024) ("[S]urvivors often do not report their assaults because they do not want others to know about the assault, want to handle it themselves, fear retaliation, fear being blamed or disbelieved by

14

police, lawyers, or others involved in the criminal legal system, do not know if the incident was serious enough to report, or blame themselves for the assault.") (emphasis added).

For all those reasons, I respectfully dissent.